### ANTONIO TRIJO v. THE STATE.

#### No. 2459. Decided May 13, 1903.

**1.—Murder in First Degree—Limiting Charge to.**

On a trial for murder, in order to justify the court in failing or refusing to charge on murder in the second degree, the facts must exclude that degree of homicide; in other words, the evidence must be so cogent that a murder upon express malice was committed, that it excludes every other theory of homicide.

**2.—Same—Charge Upon Murder in Second Degree.**

No matter how atrocious the circumstances attending the homicide, if the evidence is doubtful, or in conflict, although that for the State may be in the mind of the judge conclusive in establishing murder in the first degree, nevertheless the charge should always submit murder in the second degree, the exceptions excusing such a charge being cases of murder in the perpetration of other felonies, or shown conclusively to have been upon express malice.

**3.—Same—Circumstantial Evidence.**

While it is true that the circumstances attendant upon a homicide may be so clear and cogent, throwing the defendant in such juxtaposition with the main fact as not to require a charge upon circumstantial evidence, yet where the facts are in doubt, it is always safer and sounder, under the rule, to charge in regard to circumstantial evidence.

**4.—Same.**

See facts stated in the opinion upon which it is held the court erred in failing to charge the jury as to murder in the second degree, and also upon circumstantial evidence.

Appeal from the District Court of Webb. Tried below before Hon. A. L. McLane.

Apeal from a conviction of murder in the first degree; penalty, confinement for life in the penitentiary.

Appellant was charged by the indictment with the murder of Benjamin Brondo, on the 26th day of October, 1902, by shooting him with a gun.

The important facts are stated in the opinion.

*Bethel Coopwood*, for appellant.—Appellant excepted to the charge: Because it is not the law of the case, nor the whole of the law applicable to the issues thereof; because it does not instruct as to the circumstantial evidence; because it fails to give the law as to murder in the

second degree; because it fails to instruct as to manslaughter. These four grounds were embraced by the motion for a new trial. White's Ann. Texas Crim. Proc., sec. 813, and cases there cited; Willson's Crim. Stats., sec. 2342, p. 196; Faulkner v. State, 15 Texas Crim. App., 115; Leftwich v. State, 34 Texas Crim. Rep., 489; Taylor v. State, 27 Texas Crim. App., 465; Crowley v. State, 26 Texas Crim. App., 579; Crowell y. State, 24 Texas Crim. App., 409; Counts v. State, 19 Texas Crim. App., 450; Black v. State, 18 Texas Crim App., 129; Sullivan v. State, 18 Texas Crim. App., 628; White v. State, 18 Texas Crim. App., 57; Wright v. State, 18 Texas Crim. App., 63; Riley v. State, 19 Texas Crim. App., 105, 106; Norwood v. State, 20 Texas Crim. App., 304-307; Parker v. State, 20 Texas Crim. App., 454, 455; Ramirez v. State, 20 Texas Crim. App., 134; Fuller v. State, 24 Texas Crim. App., 606; Hunt v. State, 7 Texas Crim. App., 235-238; 3 Am. and Eng. Enc. of Law, 439; People v. Le Roy, 4 Pac. Rep. (Cal.), 449; People v. Val Verde, 59 Cal., 457; Wharton Crim. Ev., 9 ed., sec. 423; State v. Erl, 53 Iowa, 69; Bergin v. People, 17 Ill., 427; 65 Am. Dec., 673; People v. Parton, 49 Cal., 632; Frazer v. State, 55 Ga., 326.

*Howard Martin,* Assistant Attorney General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the first degree, the penalty assessed being life imprisonment in the penitentiary.

On the night of the killing the witness De la Rosa and deceased met in a saloon about midnight. After drinking beer, they had some conversation, which witness says was in a joking manner, while other of the eyewitnesses thought it presaged a difficulty. The two went outside the saloon and deceased embraced witness and remarked, "They [referring to the people in the saloon] think we are going to fight, but we are too good friends to do that;" that deceased asked the witness, "to go for a spin with him and get a drink of mescal at Celestina's, who lives across the track." Another witness, Rodriguez, a shoemaker, was with them. The three went up a street north from the saloon across the track, and went to Celestina Aguilar's house. Deceased knocked on the door, and the door was either opened for him or he opened it, and went inside the room. This witness heard talking inside the room, but did not distinguish what was said. A moment after deceased entered the room defendant came out and passed Rodriguez and witness, and went up the street west. Just after defendant left, deceased came to the door and told witness and Rodriguez they could go, as he intended to stay all night. Rodriguez and witness went down the street, east, until they reached the corner of a block, where Rodriguez asked witness to wait a few moments while he went home and secured some money with which to buy the drinks. Witness waited awhile, and until Rodriguez returned. Just as Rodriguez rejoined him, a shot was heard in the direction of Celestina's residence; and he said to Rodriguez, "Let's go and

see what has happened." As he reached Celestina's he heard the blow of a police whistle, and asked Celestina what had happened? And she replied "the shot was fired just outside of her window." This witness further testifies he saw some one running up the street west, and started after him, but, failing to overtake him, returned to the residence of Celestina; went around the corner of the house and found deceased lying on the ground, face up, dead; and remarked to Celestina, "It is Brondo" (deceased), and asked her what she was going to do about it. And she said, "Notify the police." This shot occurred, according to this witness, about an hour and a half after they left Celestina's and about 2 :30 in the morning. A pistol was lying on the ground at the feet of deceased. On cross-examination he stated that when he went to the house to see who was shot, he lighted a match Celestina had handed him through the door. She did not come out. After defendant came out of the house and walked west, witness did not see him again. There is a window in the west side of the house, and a door in the south side. Deceased went in the door and defendant came out of the same door, and went straight west. The body was lying north and south, the head to the south, and the feet north immediately under the window. This witness testified that he did not know whether or not deceased had a pistol on the night in question. The testimony of Rodriguez is similar to that of the preceding witness. However, he did not see any match struck, as testified by De la Rosa, and did not go to the body of deceased with De la Rosa.

The physician testified in regard to post-mortem examination of deceased, stating that the shot which produced his death entered the back of the neck and came out of his chin and windpipe in front, the spinal column being broken. He says the bullet might have been a 38 or 44-caliber, and caused death instantly. Celestina Aguilar states that she knew defendant and deceased; that defendant came to her house about 2 o'clock on the morning deceased was killed, and asked her to open the door, which she refused. He then forced his way into the house, grabbed and tried to stop witness, and for a little while was striking at witness. She caught him and held him, and heard two or three persons approaching the house. Deceased came to the door, knocked and said, "Celestina! Celestina!" and defendant did not want witness to answer, and was angry. She told him that her mouth was her own, and that she would answer. Deceased opened the door, came in and asked for a drink of mescal. "Defendant raised the mosquito bar, and stood up." She informed deceased she had no mescal, and defendant told deceased to get out of the room, in an angry voice; and deceased kept asking for mescal. Defendant then went to the door, stood, and said to deceased, "You stay with the whore; she has her customers that visit her at night," and then took his departure. Deceased remained in the room, asking for a drink. Witness begged him to leave, informing him that defendant was a very bad man; she knew him well, and that he

45 Crim.—9.

would return and do some injury. Deceased went to the door, and told some one outside to go away, that he was going to stay; and witness entreated deceased to leave also. Finally deceased concluded to leave, and went out of the door. Witness immediately shut and tied the door with a rope which defendant had cut. She was very sleepy, having been up two nights without sleep, and had come in on the train from Mexico, and immediately threw herself on the bed and went to sleep. She was aroused by a pistol shot near the window where her bed was situated. She got up from the bed, and saw defendant at the window. He remarked to her, "Hist, Celestina; be careful not to say that I did it." Smoke was coming in through the shutters of the window. She did not see any arms about defendant. He had changed his coat since he had left her house and before the shooting. Upon his making the remark to her, he went away. Witness aroused her daughter, who began blowing the police whistle. After blowing the police whistle, witnesses De la Rosa and Rodriguez came to the house and asked what had happened, and witness informed them that defendant had fired a shot by her window, but did not know who he hit. Defendant lived several blocks west of witnesses' house, and had been drinking that night at a dance at his (defendant's) place. She denied lighting a match when De la Rosa came after the shot was fired. The window is in the west side of the house and was up. She denied dropping the pistol out of the window, and did not know that the pistol was there. Defendant had treated witness badly on several occasions, and she had made complaint against him during last December. He had assaulted her in March, and of this she had made no complaint. She had never had any trouble with deceased.

Brennan, city marshal of Laredo, testified: That he went to defendant's house after the shooting and failed to find him; found an empty Winchester scabbard, and part of a box of 44-caliber cartridges; found, just outside the door of defendant's house, some of the same character of cartridges on the ground, and finger marks, as if some one had dropped them and tried to pick them up; found an empty shell of same kind of cartridge in defendant's house; also an empty shell near the body of deceased of the same kind, both of which empty shells he had with him at the time he was testifying. There was a dance that night at another house in defendant's yard.

Defendant introduced some evidence showing the words occurring between himself and De la Rosa at the saloon were friendly and jocular. However, some of the witnesses seem to have gathered from this conversation that a fight was imminent. De la Rosa had on a blue checked jumper or blouse. Perhaps this is a sufficient statement of the evidence to bring in review the questions suggested by appellant for reversal.

The court submitted the sole issue of murder in the first degree. Exception was reserved for the failure to charge upon the issue of murder in the second degree. There was no eyewitness to the homicide under the State's case made by this record. The killing occurred in the dark,

outside the room of Celestina Aguilar. Her testimony and the statements of appellant to her would tend to show that he committed the homicide; at lease, her evidence places him in such position that he could have been the slayer of deceased. However, the uncontroverted testimony shows that there was a pistol lying by the body of deceased. This pistol was not identified. The condition of the pistol was not shown or atcempted to be shown, as to whether it had been fired or was the property of deceased, or how it came there. Just the stern fact, left without explanation, that, by the body of deceased, this pistol was found. The circumstances attending the killing, what brought it about, what occurred as the res gestae of the transaction, what was said and done between the parties, if anything, whether deceased or appellant, was the aggressor, is, to say the least of it, but matters of inference. In order to justify the court in failing or refusing to charge on murder in the second degree, the facts must exclude that degree of homicide; in other words, the evidence must be so cogent that a murder upon express malice was committed, that it excludes every other theory of homicide. If the testimony of the witness Aguilar is true, then we have a pistol shot fired near her window, which aroused her from sleep. After getting up·and approaching the window, she found appellant outside her room at the window, who remarked to her, "Hist, Celestina; be careful not to say that I did it." She saw no arms about the person of appellant. This testimony would place appellant in such position, and so environs him, that the jury might be justified in finding him the perpetrator of the homicide. Here the case, so far as the immediate circumstances that environ the difficulty, ceases. Not a word was heard, if any was spoken; no one testified as to how the difficulty came about, whether deceased or appellant was the aggressor, or whether appellant was lying in wait to wreak his vengeance, or whether, when deceased saw appellant he drew his pistol and thus produced the occasion. Under the authorities in our State, it occurs to us that the charge upon murder in the second degree should have been given. Blocker v. State, 27 Texas Crim. App., 16; Benavides v. State, 14 Texas Crim. App., 487; Couner v. State, 23 Texas Crim. App., 378; Barth v. State, 39 Texas Crim. Rep., 387. As was said in Barth's case, supra, "As a general rule, it is always best to give both degrees of murder, no matter how atrocious the circumstances attending the homicide." In any event, if the evidence is doubtful, or in conflict, though that for the State may be conclusive in the mind of the trial judge, establishing murder in the first degree, nevertheless instructions should always be given upon the lower degree of murder. If the homicide occurs in the perpetration of robbery, etc., or is conclusively shown to have occurred upon express malice; leaving no doubt or conflict in the evidence, then it would be unnecessary to charge murder in the second degree; but this case is not of that character.

It is also seriously contended that the case was one of circumstantial evidence, and exception is applicable to this character of case. Where an issue in a case is left in doubt by the evidence, that doubt should

always be solved in favor of the accused. If the presumption of inno-
cence and reasonable doubt mean anything, it is of a peculiar force at
this particular point. The facts should never be resolved in favor of
guilt or against reasonable doubt by the trial court in submitting a
charge upon the law. While it is true that the circumstances may be
so close and cogent, throwing the accused in such juxtaposition with the
main fact that it may not require a charge upon circumstantial evidence,
yet, where the facts are in doubt upon this theory, it is the safer and
sounder rule to charge in regard to circumstantial evidence. In order to
justify the trial court in not charging upon this phase of the law, it
must be taken as certain, first, that the witness Aguillar testified truth-
fully; and, growing out of that, secondly, that appellant was at the win-
dow, as testified by her; and thirdly, that his remark to her was a con-
fession to the killing. While these conclusions of the court may or may
not be proper deductions from the testimony, still we do not believe it
of sufficient cogency to exempt it from the rules of circumstantial evi-
dence, or bring it within the rules of positive evidence to the exclusion of
the law of circumstantial evidence. Upon another trial the court should
give this phase of the law. For the errors discussed, the judgment is
reversed and the cause remanded.

*Reversed and remanded.*