## JACK EARLY v. THE STATE.

### No. 3185.     Decided October 17, 1906.

#### 1.—Murder—Evidence—City Ordinance—Arrest Without Warrant.

Upon trial for murder where the evidence showed that deceased was killed in attempting an arrest of defendant's codefendant for drunkenness in a public place, without warrant, there was no error in permitting the State to prove that said defendant was drunk on the evening of the difficulty, immediately preceding and at the time of the difficulty; and the introduction of the minutes of the city council of an incorporated town showing the appointment of deceased as policeman of said town, under the ordinances thereof; as authorized by the Constitution and the laws of the State of Texas, for the purpose of proving that deceased had a right to arrest the party without warrant, and that he was in the lawful discharge of his official duties at the time of his death.

#### 2.—Same—Minutes of City Council—Appointment of Policeman—Public Place.

Upon a trial for murder where the evidence showed that the deceased was killed while attempting an arrest of defendant's codefendant for drunkenness in a public place, without warrant, as a policeman of an incorporated village, there was no error in permitting a State's witness to testify that the book he produced contained a correct minute of the meeting of the city council of said town or village at which deceased was appointed policeman.

#### 3.—Same—Charge of Court—Weapon Used—Intent to Kill.

Where upon trial for murder the evidence showed that the knife used was a very large spring-back knife, the blade of which was something over three inches long, there was no error to charge with reference to a deadly weapon the manner in which it was used and intent to kill.

#### 4.—Same—Circumstantial Evidence—Charge of Court.

Upon trial for murder, where the evidence showed that defendant was at the scene of the homicide, by his own confession; but there was no positive testimony of any guilty participancy by defendant in the homicide, and that he expressly disclaimed such complicity, the court should have charged the law of circumstantial evidence.

Appeal from the District Court of Hill. Tried below before the Hon. W. C. Wear.

Appeal from a conviction of murder in the second degree; penalty, fifteen years imprisonment in the penitentiary.

The opinion states the case.

*Alva Bryan, Morrow & Smithdeal,* for appellant.—On the question of arresting without warrant: Lacy v. State, 7 Texas Crim. App., 403; Luera v. State, 12 Texas Crim. App., 261; Carter v. State, 30 Texas Crim. Rep., 551; Allen v. State, 66 S. W. Rep., 674; Cortez v. State, 69 S. W. Rep., 536; Hamess v. State, 76 Texas, 571.

*Howard Martin,* Assistant Attorney-General; *Clarke & Hart* and *Collins & Cummings,* for the State.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at fifteen years confinement in the penitentiary.

The following is a substantial statement of the facts, as set forth in the State's brief, and embraces all the essential features of the evidence adduced on the trial. "On October 24, 1905, and for more than a year prior thereto, deceased, Terrell Calloway, was and had been acting as a policeman in the town of Mt. Calm, under and by virtue of an appointment from the duly constituted authorities of the town. Defendant, Jack Early, and Harmie Horn were friends and companions. During the afternoon of the day of the difficulty, both defendant and Horn were in the town of Mt. Calm, as also was deceased. Mt. Calm is a very small town, and Axtell in McLennan County, is about ten miles therefrom—at which place there is a saloon. These towns are connected by a railroad, and the schedule of the trains was such that a party could leave Mt. Calm, go to Axtell, stay an hour there and return to Mt. Calm on the north bound train. On the night of the killing the train going from Mt. Calm to Axtell was due to arrive in Mt. Calm about 6 o'clock and 8 minutes, p. m., but was about an hour late. The depot is situated only a short distance, perhaps fifty or seventy-five yards, from Pryor's livery stable. Before the train left Mt. Calm for Axtell, deceased procured a two horse buggy from the livery stable and drove out of town to attend to some business. In a short time after deceased drove away from the livery stable, defendant and Harmie Horn, in company with several other parties boarded the train at Mt. Calm and went to Axtell. The record shows they remained at Axtell about one hour, and when they reached Axtell they went to a saloon and remained there during the entire time. During that time Harmie Horn took at least one drink of whisky and a bottle of beer. The same party returned to Mt. Calm on the train— Harmie Horn bringing a quart of whisky, and each of the party doing likewise; one having as many as eight quarts. Returning to Mt. Calm on the train the party drank a bottle of wine—Horn being one of the number. When they reached Mt. Calm the entire party, including defendant and Horn, repaired to Pryor's livery stable. At this time deceased had not returned from his drive to the country. Horn and Early reached the livery stable about 10:30 o'clock. They went in the office, and some of the whisky was opened and two bottles were passed around among the crowd, and Horn was seen to take several drinks. The undisputed testimony shows Horn was considerably under the influence of liquor when he first came to the stable, and that after he came he took several more drinks of whisky. The various members of the party at the stable left at different times, until there was no one there except appellant, Harmie Horn, and Will Harris (an employee of the stable and slept in the office). Harris did not go to Axtell. From the time appellant and Horn returned from Axtell until they started to leave, one hour elapsed. During that hour appellant had gone out on a drive with some negro women, and when he returned to the table only Harmie Horn and Harris were there. Horn and Early continued to stay at the stable for some time after

Early had returned from his drive with the women. At this time, according to the undisputed testimony, Horn was very drunk. Early was boarding at the house of Mat Steddum, some three hundred yards east of the livery stable. Early invited Horn to go with him to Mat Steddum's house, and spend the night. A gasoline lantern was hanging in the middle of the barn, the light shining full into the street. Appellant and Horn started to leave the barn about 11:30 o'clock. Alongside of the barn and adjoining it is a buggy shed. As Horn and Early emerged from the door of the livery stable, Horn staggered and fell—in full glare of the light hanging in the door, and was so drunk it required two or three minutes for Early to assist him to his feet. They then turned north and walked in the direction of the northwest corner of the buggy shed, which corner was — feet from the center of the livery barn door. They made no stop between the barn door and the corner of the buggy shed. By the time they reached the corner of the buggy shed, deceased had driven up in front of the barn door and had gotten out of the buggy on the north side, which was next to Early and Horn. At this time, Early and Horn were in sight of Calloway and Harris—the last two being in the light when Harris received the team from deceased. Deceased assisted Harris in taking the team loose from the buggy. Harris led the horses into the barn. Horn and Early then turned east around the corner of the buggy shed, and Calloway walked north from the barn door toward the corner of the buggy shed, where Horn and Early had been. Harris carried the team on in the barn; took the harness off and put the horses in the stalls, went into the office, immediately undressed and went to bed. While Harris was putting the horses away, he heard some loud laughing in the direction the parties had gone, but paid no attention to it. After he had gone to bed he was aroused by appellant calling him by name at the front door of the barn. The lantern at the barn door was still burning. He lighted a light in the office and was dressing himself, when appellant walked in the office with the pistol of deceased in his hand, and told Harris that Calloway was trying to arrest Horn, and Horn had refused to be arrested and the fight took place. Appellant said, 'Will, here is Terrell's pistol, where would be a good place to put it?' Appellant laid the pistol on the desk in the office, and said he had picked it up off the ground. He said that when Calloway tried to arrest Horn, Horn refused to be arrested, and the fight took place, and Horn had beat all the face off of Calloway. Harris then accompanied appellant out to a vacant lot back of the livery stable, and back of the livery stable lot, and there found deceased lying flat on his back, and Harmie Horn leaning over him. Early and Harris had brought with them from the livery stable a lantern which they gave to Harmie Horn. Early and Harris picked up the body of deceased and carried it into the livery stable, Horn carrying the lantern in front of them. When they reached the stable, Harris went to the telephone and called for Doctor Barrett. While

he was at the telephone, defendant and Horn held a conference. Harris did not understand what they were talking about, except he heard one of them say something about getting a horse at the stable. In a short time after Harris talked over the telephone, Will Steddum (the telephone operator) came to the stable, and soon afterwards Dr. Barrett, John Stirman, Major Nichols, Dr. Raddey and others came. After Will Steddum came, appellant said that Calloway had attempted to arrest Horn and Horn resisted and then the fight took place, and that Horn had refused to be arrested. He said that he did not try to separate them; that he saw a knife flashing around and a pistol. While Steddum and Harris were trying to minister to the wants of the dying man, appellant and Horn, after conferring together, took their departure. Appellant went to Mat Steddum's house, borrowed a horse, and was not seen any more for an hour or two, when the city marshal met him in the road a mile from Mt. Calm riding a horse in a gallop. And Harmie Horn was not seen until the following morning, when he was arrested some four or five miles from Mt. Calm.

"Situated some twenty-five or thirty steps north of the scene of the difficulty is a gin office which was occupied on the night of the difficulty by the witness, A. J. Nelson, as a sleeping apartment. Nelson had retired and gone to sleep, and was aroused by a noise on the outside. The first thing he heard was some one saying, 'That will do. Let him up.' He then looked out of his window, and saw the bulk of men out some distance from the office, one standing up and another in a low position. The man standing up was moving about a little and he could tell that it was a man. The other object in the low position he could not tell whether it was one or two men at that time. The man standing up commenced calling, 'Will Harris,' and left and went in the direction of the barn, and after he had gone he heard Horn saying to Calloway, 'Wake up, Terrell, wake up.' Horn was on his knees in a low position; and when Early and Harris returned with the lantern he could see that Calloway was lying flat upon the ground. An examination of the wounds upon the body of deceased showed that he had been literally cut to pieces. His clothing was muddy and entirely saturated with blood. There were numerous mortal wounds upon his body. He had a contused wound on his forehead above the eye and extending down across the eye to the cheek, made by a blow; a deep stab in the arm and a long gash across the shoulder. One wound three inches long on top of the shoulder blade, getting shallower as it went to the spinal column. A deep wound lower down on the shoulder blade. A deep wound near the spinal column. A large hole below the shoulder about three and a half inches deep coming out at a small opening. A stab in the right side passing into the liver. A severe cut across the right thigh three or four inches long, and a great many minor cuts. All the wounds upon his body, except the contused wound across his eye, were knife wounds. Appellant and Horn were each shown to have owned a large spring-back

knife, with blades three or four inches long.  Appellant was shown to have worn on the night of the difficulty a hat with a yellow leather hat band.  After he was arrested he had on a hat without any hat band.  Harmie Horn wore a cap without a leather hat band, and deceased, Terrell Calloway, wore a black hat without a leather hat band.  Calloway was a man more than thirty years of age, weighing one hundred and sixty pounds, armed with a 38-caliber pistol.  Horn and Early were each young men, nineteen or twenty years of age, weighing about one hundred and seventy-five pounds each.  The ground at and around the scene of the difficulty was very muddy, and when viewed by the witnesses on the following morning showed evidence of a desperate struggle extending over a space of ground twenty or twenty-five feet in length, and from four to eight feet wide.  Knee prints and elbow prints showed plainly in the mud.  At the immediate spot where the body of deceased was picked up, there were two blood spots. one a very large one.  Upon either side of the blood spot, and about eighteen inches apart showed two knee prints, evidencing the fact that some one had sat astride the body of deceased.  The leather hat band of appellant was found upon the ground where the evidence of the struggle was shown.  A pair of twisters used by Calloway in attempting to make the arrest was found tramped in the mud.  A piece of buggy whip that Calloway was in the habit of carrying was found broken, lying upon the ground at the scene of the difficulty.  The only evidence of violence shown upon the person of Harmie Horn was a small contused wound on his forehead.  The feeling of appellant toward deceased was one of malice, bitterness, and hatred.  A few days before the difficulty, appellant, Harmie Horn, and two others were in front of the postoffice in the town of Mt. Calm, and the postmaster, L. C. Guinn, heard appellant say that Terrell Calloway was a damn scoundrel, and a rascal, and that he would not be arrested by Calloway.  Witness Guinn testified that appellant when he used the language spoke in an angry manner.  On the very night of the difficulty, while appellant and Harmie Horn were at the depot, waiting to take the train for Axtell, they had a conversation with John Stirman in which conversation appellant used this language: 'We don't like Calloway.  He has not treated us right.'  That conversation occurred at 8 o'clock, which was about three hours and a half before the killing.

"The record shows that appellant and Horn both knew that Calloway was a policeman.  It also shows that Early knew Horn was drunk at the time of the difficulty, and at the time that Calloway undertook to arrest Horn—because a few minutes before he had picked him up in front of the livery stable; and after the killing, in a conversation with John Stirman, appellant stated that Horn was pretty drunk."

Appellant's 3rd, 4th and 5th assignments of error complain of the court permitting the State to prove that Harmie Horn was drunk on the evening of the difficulty, immediately preceding and at the time

of the difficulty. Appellant's insistence is that although said Horn was drunk, and was drunk in the presence of deceased, that deceased would have no right to arrest said Horn without a warrant. The evidence establishes that he was drunk and in a public place, and deceased saw him. Deceased at the time was a policeman of the town of Mt. Calm, in Hill County, a municipal corporation duly incorporated under the Town and Village Act. Article 249, Code Criminal Procedure, provides: "The municipal authorities of towns and cities may establish rules authorizing the arrest without warrant of persons found in suspicious places, and under circumstances which reasonably show that such persons have been guilty of some felony or breach of the peace, or threaten, or are about to commit some offense against the laws." Article 593, Revised Civil Statutes, prescribing the power of the board of aldermen of towns and villages, provides: "The mayor shall be the president of the board of aldermen, and shall, with three of the aldermen, constitute a quorum for the transaction of business; and the quorum shall have power to enact such bylaws and ordinances not inconsistent with the laws and Constitution of the State as shall be deemed proper for the government of the corporation." Article 598 provides: "The board of aldermen shall have power to appoint such officers, other than those mentioned in this chapter, as shall be deemed necessary to carry out the provisions of the same, to prescribe their duties and to fix their compensation; and shall also have power to dismiss them at any time, and appoint others in their stead." Article 607 declares that, "The marshal shall have the same power within the town that constables shall have within their precincts, and shall be entitled to the same fees. He shall discharge all other duties that may be prescribed by the bylaws and ordinances, not inconsistent with the laws of the State, and shall receive therefor such fees as may be fixed by the board." The ordinances of the town of Mt. Calm prescribe and make drunkenness in a public place an offense, as shown by article 116 of the Ordinances of said town, making the punishment not exceeding a fine of $100. And article 218 of said Ordinances provides: "That it shall be the duty of the town marshal and all policemen of this town to arrest any and all offenders against the Town Ordinances, without warrant, for offenses committed in their presence and view, and to take such offenders before the Mayor and there make the charge or charges against the accused, and sign the same officially." The minutes of the city council of Mt. Calm show the appointment of deceased, Terrell Calloway, as policeman of said town. The appointment was made at a regular session. It is further shown that deceased, Calloway, performed the duties of policeman under said appointment for some time prior to his death. We hold that the court did not err in permitting the introduction of said testimony, nor in the introduction of said ordinances of said town, for the purpose of proving that deceased was in the lawful discharge of his official duty at the time of his death. The town of Mt. Calm had the author-

ity under the Constitution and laws of this State to authorize the arrest of one found drunk in a public place, by an officer, without warrant. If there was anything in the ordinances authorizing this, inconsistent with any State law, the insistence might be made that it was invalid, but in no sense could it be regarded as inconsistent with the laws of the State. The authority to arrest without warrant, for violating such town ordinances, was upheld in Roberts v. State, 14 Mo., 137; Moseley v. State (Texas Crim. App), 4 S. W. Rep., 907. In Pratt v. Brown, 80 Texas, 612, our supreme court holds that an arrest can be made for drunkenness without warrant. In Beville v. State, 16 Texas Crim. App., 70, Judge Hurt, delivering the opinion of the court, quotes with approval from Scircle v. Neeves, 47 Ind., 289: "There is probably not a city or town in the State making any pretense to proper municipal government that has not an ordinance in substance the same as this (one making drunkenness an offense), and whose police officers do not constantly arrest, lock up and afterward carry before the courts, persons who violate its provisions. Such persons must learn that society has the right to protect itself against the evil influences of their example, and that they are proper objects of municipal legislation, arrest and punishment. This we believe to be the correct doctrine." In that case appellant was prosecuted for false imprisonment, in that he arrested prosecutor for drunkenness in the town of Decatur, without warrant. The court held the evidence showed he had ample authority, under the ordinances of the city of Decatur, to arrest him for such offense, and having such authority, there was no legal basis for the prosecution. But aside from these authorities, and many others that could be cited, we hold as an original proposition that the city had a right to pass the ordinance, and under its provisions deceased had the right to arrest Horn, appellant's companion.

The 8th, 9th and 12th assignments of error complain that the court erred in permitting Cresswell to testify that the book he produced contained a correct minute of the meeting of the city council of Mt. Calm, at which Terrell Calloway was appointed policeman. The grounds of objection being that the council could not appoint a policeman. Article 598, Revised Civil Statutes, answers this proposition, wherein it empowers the board of aldermen to appoint such officers other than those mentioned in the Town and Village Act, as said board may deem necessary. The minute book of the town of Mt. Calm introduced in evidence, shows that deceased was properly and legally appointed a policeman of said town.

Appellant complains of the 19th paragraph of the court's charge, which is, as follows: "In this connection you are charged that, unless you believe beyond a reasonable doubt that the instrument used in inflicting the wounds upon deceased was a deadly weapon, you cannot convict defendant of any degree of homicide, unless you further believe from the evidence beyond a reasonable doubt that from the manner and mode of its

use, if any, an intention to kill evidently appears, and unless you so believe beyond a reasonable doubt, you will acquit defendant of any grade of homicide." As we view the evidence, it shows that the knife was a very large spring-back knife, the blade of which was something over three inches long. If this be true, then the charge was highly beneficial to appellant. But if the knife was smaller than the one suggested, then the issue would be in the case, and the charge would be highly proper. In no event could it have injured appellant.

Appellant's thirtieth assignment of error complains that the court erred in failing to charge on the law of circumstantial evidence. The evidence for the State shows appellant was at the scene of the homicide. This is made manifest by circumstantial evidence as well as by appellant's confession. But there is no positive testimony of any guilty participancy by appellant in the homicide. Appellant expressly disclaims any participancy, and the fact that he assisted in the commission of the crime, if established, is by circumstantial evidence alone. This being true, it was the duty of the court to charge the law of circumstantial evidence. Jones v. State, 34 Texas Crim. Rep., 491; Puryear v. State, 28 Texas Crim. App., 73; Riley v. State, 2') Texas Crim. App., 105; Trejo v. State, 74 S. W. Rep., 546; Beason v. State, 67 S. W. Rep., 98; Crowell v. State, 24 Texas Crim. App., 404.

We have carefully reviewed all of appellant's assignments of error, and do not consider any of them well taken, except the one just discussed.

For the error of the court in failing to charge on circumstantial evidence, the judgment is reversed and the cause remanded.

*Reversed and remanded.*