## J. L. Leggett v. The State.

### No. 8533.   Delivered February 4, 1925.

**1.—Murder—Continuance—Refusal of—Error.**

Appellant made an application for a continuance because of the absence of Mr. and Mrs. Galyean, who had been subpoenaed, but whose presence at the trial was prevented by the physical condition of Mrs. Galyean and the necessity of her husband's attendance upon her, at the time. The testimony of these two witnesses is shown to have been very material, and the trial court was in error in refusing the continuance, and in also refusing to grant a motion for a new trial.

**2.—Same—Charge of Court—Circumstantial Evidence—Erroneously Refused.**

Appellant excepted to the court's failure to charge on the law of circumstantial evidence, and also requested a special charge submitting that issue. There was no direct evidence of the actual assault which resulted in the death of deceased, the testimony of witness Ashby of declarations made by appellant being of too vague and indefinite a character. The trial court erred in failing to charge on circumstantial evidence.

**3.—Same—Charge of Court—Should Submit Affirmative Theory.**

This court has announced in many cases that if there be an affirmative theory advanced by the defense, that the court should submit it to the jury. Appellant also asked a special charge to the effect that if the jury found that appellant went to the room of deceased, and spoke to him in a friendly manner relative to the whipping of the child, and that without other provocation deceased assaulted him, and appellant struck and cut the deceased, to acquit him. We think the substance of this charge should have been given, and its refusal deprived appellant of having his theory of the difficulty passed upon by the jury.

Appeal from the District Court of Cottle County.  Tried below before the Hon. J. H. Milam, Judge.

Appeal from a conviction of murder, penalty five years in the penitentiary.

The opinion states the case.

*Fires & Williams,* of Childress, for appellant.

*Tom Garrard,* State's Attorney, and *Grover C. Morris,* Assistant State's Attorney, for the State.

LATTIMORE, JUDGE.—Appellant was convicted in the district court of Cottle county of murder, and his punishment fixed at five years in the penitentiary.

Deceased was the son-in-law of appellant.  The families were living in the same house and were composed respectively of appellant, his wife and three sons; that of the deceased, consisting of himself, his wife and two babies, the older of which was eighteen months old. Appellant and deceased, as far as the record discloses, had never had a particle of friction or trouble prior to the night of the homicide. It is undisputed that appellant and deceased went together from their home to the little town of Tell on the day of the homicide and came back late in the afternoon.  Each man did his chores, and ate his supper.  The record is without divergence of testimony up to this point.

For the state it is shown that one Ashby, who had been a deputy sheriff for a number of years, but was not such at the time, was called to appellant's house about 8:30 on the night of the occurrence.  He went to the place with another son-in-law of appellant named Galyean and the wife of the latter.  Ashby said when he reached the house appellant was lying on a bed and had a bruised place or cut which was bleeding, over his eye; there was blood on the pillow, also on appellant's cheek and other parts of his face.  Ashby said, "I spoke to Mr. Leggett when I went in and he said he was the one that done the work."  I went on into another room where deceased and his wife and a young man named Melton were.  Deceased was lying on a bed.  In about thirty minutes a doctor came and witness assisted him in removing the clothes from deceased, and said that when they removed his underwear they first saw a stab in the breast of deceased.  When they turned him over there were a number of stabs and cuts in the back of deceased ranging from the back of his neck down to just above his hip bone.  Blood was running out of the lowest cut.  There was much blood on the floor and some on the walls and door knobs and bed of the room.  Alfred Leggett met witness in the house and said he wanted "to give up" to witness, who told him that he was not then a deputy sheriff.

Alfred wanted witness to take him to Paducah. He said he was the one who cut Mr. Jarvis and he wanted to give up. On cross-examination of this witness he said that defendant "told me he had done the trick. I couldn't say just what else the old gentleman did say. As to his saying anything else, will say he talked some. I couldn't tell you just what he did say. We were talking there but as far as telling exactly what Mr. Leggett said, I don't know as I could tell you." Further the witness testified as follows:

"I guess Mr. Leggett heard Alfred say that he was the one that did the work, that he was the one that cut him with a knife   *   *   * Mr. Leggett did not speak up and say, 'No, I did it.' If Mr. Leggett said anything I didn't hear it."

Dr. Morgan was the next witness for the state, who testified that he was called to see deceased on the night of the homicide and he described the different stabs on his body. He attributed the cause of death to a stab wound in the liver, which caused such loss of blood as to produce death. He said that the wounds were stabs and were not cut out at all except one which was in the right shoulder and arm which was not very deep. The State also introduced Arthur Melton who said that he lived about 300 yards from the house of appellant, and was called by Floyd Leggett that night to come down to the house. He said Floyd came to his house and said: "Run over to the house quick. They have had a fight and Marion is bleeding to death." Witness said that when he got to the Leggett home he went into the room where deceased and his wife were and deceased said, "They all got on me," and his wife said, "They cut him to death over nothing." He details no other statement made by deceased or his wife. This witness described the blood on the floor and different parts of the room in which deceased and his wife were, and testified that he saw appellant and said, "This looks pretty bad," and appellant said he could not account for it, could not account for what happened, and that Alfred Leggett said he done it himself, done the cutting himself, and he showed witness a cut across the palm of his hand, saying, "See here, where the son-of-a-bitch cut me."

For the defendant, appellant and his wife and daughter—the wife of deceased, testified that on the night of the homicide appellant was not well and was taking medicine and laid down after supper. That deceased and his wife and children were in their room adjoining that occupied by appellant; that the eighteen-months-old child of deceased began crying violently and appellant's wife went in and got him and brought him back to the room occupied by appellant; that the child got quiet and its mother came in and took it back into their room. She said in her testimony that she knew her father was not well and she did not want the child to bother

him. They all testified that soon after being taken back into the room of deceased, the child again began crying violently and that deceased began to spank it, which seemed to increase its crying. They testified that at this juncture appellant got up and went into the room of his son-in-law and wanted the child turned over to him, and said in a remonstrating way to deceased that the child did not know what it was being whipped for. At this juncture deceased became very angry. Mrs. Leggett, wife of appellant, said she heard deceased use some curse words and heard a lick and that she jumped up and ran to the door leading into the room of deceased and the latter had knocked Mr. Leggett down and he was on his hands and knees trying to get up, and just as she stepped to the door deceased knocked him down again with a chair. She said that her young son, Floyd, ran in at this time and took hold of appellant and dragged him out into the hall and that her other son, Alfred, who was in bed, stepped around his father and asked deceased what on earth does this mean, and that deceased used some kind of curse word and said, "I will kill you," and started at Alfred with a butcher knife. Witness says that as they started at each other she fainted and did not know anything for a few minutes; that when she came to she went at once into their room and appellant was on the bed with his head tied up, and that the side of his face and nose were bloody. She testified that appellant seemed unconscious until along towards daylight; that his head was very badly hurt, and that it took about three weeks for him to recover. She testified that her husband and son-in-law, deceased, had been on perfectly friendly terms during all their association and that nothing occurred to precipitate the trouble except her husband's interference, in the whipping of the baby. Appellant testified as to what occurred when he went into the room and remonstrated with deceased for whipping the baby, and said that during the afternoon deceased had taken a drink or two of liquor and that when he spoke to him deceased cursed him and told him that he would kill him. That this was the first unkind word deceased had ever spoken to him and that he said, "Marion, we have never had any trouble, not even a short word," and deceased picked up a chair and struck him over the eye and knocked him down and rendered him unconscious; that he knew almost nothing until about day. The wife of deceased testified that when her father came into the room and spoke to her husband about whipping the baby that deceased said that he would get up and kill him and did get up and knock appellant down with a chair. Both she and the wife of appellant denied that appellant at the time had a knife, and denied that he struck deceased with anything. The wife of deceased further testified that after her father was knocked down

her brother, Alfred, came into the room and her husband started at Alfred and they clinched, her husband having his arms around Alfred's body and Alfred having his arms around the body of her husband; that they fought in that condition for a few minutes and then separated, and her husband first sat down in a chair and then got up and went to a bed. She denied that her husband made any statement to young Melton after he got there as to how the trouble came up, and also said she did not make any statement to Melton to the effect that they all jumped on him and had cut him up and that they did not have any reason for it. She said they made no statement to Melton. She said she saw her husband talking to her brother-in-law, Mr. Galyean. The sheriff of the county testified that he saw appellant some twenty-four hours after the difficulty and that he then had a bruised place on the side of his head and a big knot over his eye, and that his face was bloody and his head wrapped up. He said he saw him some time after that and his face was still blue. Appellant proved a good reputation for peace and quietude in the communities where he had lived. In its rebuttal testimony the State combated the proposition that deceased had had any liquor on the evening or night of the difficulty. The State introduced Dr. Pitman in rebuttal, who said that he reached the scene some time before Dr. Morgan and was with deceased three or four hours and until he was carried away to Childress; that soon after he got there he gave deceased morphine and the latter made no statement that he could remember. The State also introduced witnesses to testify to the fact that appellant was not unconscious on the night of the difficulty.

Appellant made an application for a continuance because of the absence of Mr. and Mrs. Galyean, who had been subpoenaed, but whose presence at the trial was prevented by the physical condition of Mrs. Galyean and the necessity of her husband's attendance upon her at the time. This was shown by the certificate of a physician, and was not combated. In our judgment the testimony of the absent witnesses was very material. The State's case is entirely bare of any testimony showing motive either on the part of appellant or any of his sons for an attack of any kind upon deceased. The defensive theory, supported by the testimony of several witnesses, was that the beginning of the difficulty was an attack upon appellant by deceased, the motive for which was anger because of interference by appellant with deceased while the latter was whipping his eighteen-months old son. No one seems to dispute the proposition that deceased was cut by Alfred Leggett. Alfred told Ashby, the first State witness, on the night of the difficulty that he cut deceased. The wife of deceased testified aside from the assault made by her husband upon appellant, the only

difficulty that took place was between Alfred and deceased. The wife of appellant testified that after deceased had assaulted her husband with the chair, Alfred came in and she saw him and deceased going together and she fainted. The application for continuance sets up that appellant expected to show by Mr. Galyean that a short time after the difficulty he went to the scene and while deceased was still bleeding and suffering, he said to Galyean that neither of the defendants were to be blamed, that he, deceased, was the cause of the difficulty and was in the wrong. By Mrs. Galyean the defense expected to prove that appellant was injured when she first saw him that night, that his face and clothes were bloody and that he had a deep cut on his forehead from which blood was flowing when she first saw him, and that he was at that time unconscious. She would further testify that on the morning following the difficulty she had occasion to dress the eighteen-months-old child of deceased, the whipping of whom elicited the remonstrance of appellant, according to the defensive theory, and that while dressing the child she discovered and observed bruised and blue places on the body of said child. This testimony would be very material as tending to establish the fact that deceased was inflicting upon the infant child such punishment as called for the remonstrance claimed by the defense as the immediate cause of the act of deceased in striking appellant. We are of opinion that the evidence of such bruises on the body of the infant might also shed much light on the mental condition of deceased. The infliction of physical punishment upon an eighteen-months-old child such as to bruise and blacken its body and limbs, would reasonably appear to reflect an angered or excited condition of mind of the party inflicting such injury. The statements made by deceased to Mr. Galyean appear to be res gestae, though this may be determined otherwise upon a more extended hearing. If they be res gestae and hence admissible, they materially affect the issue. Galyean was another son-in-law of appellant and his testimony might have more weight with the jury than that of blood relatives of appellant.

Appellant sought to have the case submitted to the jury upon the law of circumstantial evidence and excepted to the court's charge for its failure to submit this theory, and a special charge was presented along this line. We have carefully considered the facts and are of opinion that the law of circumstantial evidence should have been submitted. The only thing in the case that might be thought to remove it from the realm of circumstantial evidence is the testimony of Mr. Ashby, who says in one place that appellant told him he had done the work, and in another that appellant told him he had turned the trick, while in another place he is not quite clear as to what appellant's language was. It is the rule that con-

99 Tex. Crim.—12.

fessions of guilt suffice to take a case out of the realm of circumstantial evidence, but in order to do this the confession must be such as that the court or jury can determine therefrom that the accused did the act or was a guilty participant therein, and is not compelled to arrive at that conclusion by the process of inference or reasoning. Eckert v. State, 9 Texas Crim App. 105; Harris v. State, 15 Texas Crim. App., 638; Trijo v. State, 45 Texas Crim. Rep., 131; Early v. State, 50 Texas Crim. Rep., 344; Joyce v. State, 90 Texas Crim. Rep., 269; Elsworth v. State, 244 S. W. Rep., 147. There seems no question from any source but that appellant had received a blow on the head just before Ashby saw him. As to what he meant in saying that he did the work, or that he turned the trick, if he did so say, is not very clear. The State does not contend that appellant had any knife or that otherwise than by his own declaration there was proof that he did any cutting, and introduces no proof at all to this effect. The statement of deceased and his wife, testified to by State witness Melton, to the effect that "They all got on me," and that "They cut him to death for nothing," does not indicate in any way what part, if any, appellant had in the difficulty. If it means anything it would include the wife of appellant and the wife of deceased as well as the three sons of appellant, for all of these were there. Conceding that appellant made some remark to Ashby as testified, did he say that he done the work, or that he turned the trick, or what? Does this make it clear that he had in mind that he cut deceased? We do not so understand the language. If that conclusion is reached from this admission or statement, it must be by a process of inference and reasoning and the case would be brought squarely within the authorities above referred to.

Another complaint is made of the charge of the court. This court has announced in many cases that if there be an affirmative theory advanced by the defense, that the court should submit it to the jury. If we comprehend the record before us, the theory of the accused is that he went into the room of deceased with no other intent than to do an act of kindness by removing and quieting his grand-child and that his offer so to do enraged and inflamed the mind of deceased and caused him to attack the accused, and that he had nothing whatever to do with the assault, if any, made upon deceased by Alfred Leggett, but was unconscious at the time this was done. In this condition of the record appellant asked a special charge to the effect that if they found that he went to the room of deceased and spoke in a friendly manner relative to the whipping of the child in question, and that without other provocation deceased made an assault upon him, and that thereafter Alfred Leggett struck and cut deceased upon an independent impulse and not

acting in conjunction with or as the result of a previous agreement with the accused, or unless they believed beyond a reasonable doubt that these facts were not true, then he should be acquitted. We think the substance of this charge should have been given to the jury.

For the reasons mentioned, the judgment will be reversed and the cause remanded.

*Reversed and remanded.*