### JIM LANCASTER v. THE STATE.

*No. 950.     Decided April 15th, 1896.*

#### 1.   Murder—Evidence—Acts and Declarations of Defendant.

On a trial for murder, where the prosecution had introduced testimony, to the effect that a short time prior to defendant's arrest defendant and his father and uncle were seen in close, earnest and low conversation in a stall in a wagon yard, and that defendant handed a pocketbook to his father; and that defendant then proposed to prove by his father and uncle what the conversation was between them, and especially that in said conversation the father told him that, if he was guilty to get on his horse and leave the country, but that if he was innocent to stay, and he would do all he could for him; and that defendant made no effort to get away, but declared his innocence, which testimony was excluded by the court. Held: That while all that was said by the parties explanatory of their acts and conduct, was competent evidence, still such testimony as was proposed, became unnecessary in view of the fact, which was proved, that defendant made no effort to leave—which fact, in itself, was just as expressive as the testimony which was excluded, to the effect that he was innocent.

#### 2.   Same—Evidence—Motive—Rebutting Testimony.

On a trial for murder, in the perpetration of robbery, where the prosecution, in assigning a motive, proved that about a month before the homicide deceased had sold cattle for $189, which fact was known to defendant. Held: That it was incompetent for defendant, in rebuttal of this testimony, to go back of that transaction and prove that long prior thereto deceased complained of hard times and of a need of money.

#### 3.   Same—Impeachment of a Witness as to Credibility.

It is not competent, as going to discredit a witness before a jury, to question him as to his having been engaged, at some previous time, in an attempt to swindle an insurance company; but, when the witness' answers exculpate him from the charge, no error is perceived in having admitted such testimony.

#### 4.   Improper Argument of Counsel—Practice.

Where counsel, after having been admonished and reprimanded by the court for improper argument, persists in such course, the court should impose upon him such a fine as will restrain such unwarranted conduct. But, to constitute improper argument ground for a reversal, the opposing counsel must have requested the court to charge the jury to disregard such arguments, the rule being, that unless such charge is asked, such improper argument will not be cause for reversal, unless obviously of a character to impair the rights of defendant and prejudice his case before the jury.

#### 5.   Charge as to Conflicting Evidence.

A charge of the court which instructs the jury: "You should reconcile all conflicts in the testimony, if you can, but, if you cannot, you must decide which of the testi-

mony is entitled to the greater credibility and weight; and, in so determining, you may consider the intelligence, interest and apparent bias or prejudice, if any, of the witnesses, as well as the manner of the testifying." Held: Correct.

**6.  Jury Law—Taking Out Indictment With Former Verdict Indorsed Thereon.**

Where the jury were permitted to take with them, in their retirement to consider of their verdict, the indictment upon which a verdict had been written at a former trial of the case; and it appears that said former verdict is not legible; and the affidavit of the jurors who tried the case showed that the matter of the indorsement of said former verdict was not discussed or mentioned in their presence. Held: That the same constitutes no ground for complaint by appellant.

**7.  Murder in the Second Degree—Evidence Sufficient.**

See, facts, summed up in the opinion, upon which the court Holds: That a verdict and judgment for murder in the second degree imposes a meager punishment for the crime committed.

APPEAL from the District Court of Erath.    Tried below before Hon. J. S. STRAUGHAN.

This appeal is from a conviction for murder in the second degree, the punishment being assessed at seven and a half (7½) years' imprisonment in the penitentiary.

The case is sufficiently stated in the opinion.

*Cooper & Estes, Martin, George & Oxford,* and *Poindexter & Padelford,* for appellant, filed an able and interesting brief in the case, together with their argument, in which they earnestly insisted that the evidence was wholly insufficient to establish defendant's presence at, and complicity and participation in, the commission of the crime.

1.    The court erred in excluding the proposed testimony of the conversation which occurred between defendant, his father and uncle at the wagon yard.    The ground upon which this evidence was offered by defendant was, that the State, having put in evidence his act, as well as that of his father and uncle in being closeted at the time and place mentioned; and, that the State having shown that they were talking in a low tone of voice, the defendant was entitled to put in evidence all that was done or said at said time and place, and to fully explain the purpose of said conference, and the result of same and all that was done at said time and place.    Code Crim. Proc., Art. 751; Davis v. State, 3 Tex. Crim. App., 91; Stockman v. State, 24 Tex. Crim. App., 387; Harrison v. State, 20 Tex. Crim. App., 387; Green v. State, 17 Tex. Crim. App., 395; Penland v. State, 19 Tex. Crim. App., 365; Spearman v. State, 34 Tex. Crim. Rep., 279.

2.    As to the improper remarks and argument of counsel furnishing ground for reversal, they cited McKissick v. State, 26 Tex. Crim. App., 673; Crow v. State, 33 Tex. Crim. Rep., 264.

3.    The remaining portion of the brief is devoted to supposed errors in the charge of the court and the refusal of defendant's special requested instructions.

*Mann Trice,* Assistant Attorney-General, for the State.

[His brief not found in the record.]

36th Tex. Crim. App.—2.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at seven and a half years in the penitentiary, and he prosecutes this appeal.   (1) On the trial of the case the State proved, by B. T. Sargent and W. A. Porter, that, on the day of the appellant's arrest, and a short time prior thereto, they saw the defendant, Jim Lancaster, and his father, J. R. Lancaster, and his uncle, Buck Lancaster, in a stall in the wagon yard of Jim Skipper, and that they were squatted or "hunkered" down; and they saw Jim Lancaster take a book from his pocket and hand it to Dr. Lancaster.   One of said witnesses testifies that he started to hand it to Dr. Lancaster, and that Buck Lancaster hunched him in the side with his elbow as he (witness) entered the adjoining stall.   Both of said witnesses agree that said pocketbook was a long, red, side pocketbook, and opened on the side with a flap.   The witness, Sargent, testified that they were talking together low, but witness did not understand what they said.   The witness, Porter, testified that the defendant, his father and uncle were crouched down, "sorter under the stall like," with their heads a little tucked down; that he supposed that they were talking, but heard nothing that was said.   Thereupon the defendant placed J. R. Lancaster, his father, and Buck Lancaster, his uncle, on the stand, and proved by them that, after hearing that the defendant, Jim Lancaster, was suspected of being connected with the murder of the deceased, Parker, they sought an interview with him at the time and place indicated by the witnesses, Sargent and Porter, and that they were squatted or seated in said stall; that Dr. J. R. Lancaster then and there said to the defendant that he had heard that the defendant was suspected of being connected with the homicide, and that, if he was guilty of it, or had any connection with it, he wanted him to get on his (Dr. Lancaster's) horse and leave the country, and never return; but, if he was innocent of the charge, to remain, and he would stand by him.   Further, that the defendant did not hand a pocketbook, or attempt to hand a pocketbook, to his father, J. R. Lancaster, at said time, or at any other time or place.   The defendant further refers to the statement of facts as to what was proved. Thereupon the defendant offered to prove, by said J. R. Lancaster, and Buck Lancaster, that J. R. Lancaster then and there asked the defendant if he was guilty of said offense, or had any connection with it, and that the defendant then and there replied that he was as innocent of the charge as a babe unborn, and did not propose to leave the country, but to remain where he was.   The State objected to said evidence, and the court sustained the objection.   Appellant insists that said evidence was admissible, because the State had put in evidence the fact of the defendant as well as that of his father and uncle being close together at the same time and place mentioned; and, the State having shown that they were talking in a low tone, too low to be heard, the defendant was entitled to put in evidence all that was said and done at said time and place, and fully explain the purpose of said conference, and the result of the same, and all that was done in the same.   To this the court ap-

pends, as explanatory, that the State did not put in evidence anything that was said by the parties at the time, and further states that, as a matter of fact, the defendant was permitted to prove everything that was said and done at said time and place, and to fully explain the purpose of said conference, and the result of the same, and all that was said and done, save and except the proposed declaration of the defendant as to whether he was connected with the murder of J. W. Parker. In connection with this, by reference to the statement of facts upon this point, which is made a part of the bill by reference thereto, it will be seen that, in the conversation alluded to, the witness, J. R. Lancaster, testified that he told the defendant: "My son, you are suspected of being connected with that awful crime that was committed in the western part of the county, and I come to you now, and ask you if you are connected with it in any way? If you are, there is my horse and saddle. Get on it, and leave, and never show your face to me again. But if you are innocent, stay, and I will do all that I can for you,"—and that the defendant made no effort to get away. The general rule on this subject is that, when any part of an act, declaration or conversation, etc., is given in evidence by one party, the whole of the same subject may be inquired into by the other. See, Rev. Code Crim. Proc., Art. 791. Under this rule, the State having adduced the circumstances of the parties squatting down in the stall, and engaging in conversation, all that was said, explanatory of such acts and conduct, was competent evidence; but, if the defendant had, in effect, the response of the defendant by his acts and conduct, the language he may have used, it occurs to us, is unnecessary. Now, he was told by his father, if he was guilty, to take his horse and leave, but, if not, to remain. He made no effort to leave, but remains, and this fact is testified to; and it is just as expressive as the verbal testimony, which was excluded, to the effect that he was innocent. He was told to leave, and the opportunity was afforded him, if he was guilty, but to remain if he was innocent. The voluntary choice by him of the alternative presented was as effectual an answer as if he had been permitted to state, before the jury, that he was innocent of the charge. The jury could have put no other construction upon this conduct.

2. Appellant complains that the court excluded from the jury that part of the deposition of T. P. McGuire relating to the financial condition of the deceased. Said excluded testimony is as follows: "During the time I knew him, he often complained about hard times, and not having any money, and having to sell property to buy anything he had at that time—meaning the year 1887. He said he had no money. Parker always claimed to be out of money, except when he received the sum mentioned before, and would often speak of owing little debts, and wanting money to pay the same." By an inspection of this bill of exceptions, it will be seen that the appellant was permitted to go back to the year 1883, and prove by said witness the financial transactions of the deceased from that time up to the killing, and really all that was in

the alleged excluded testimony was admitted. So far as the State was concerned in assigning the motive of the robbery, by showing that the deceased had money, it did not go back of the transaction which occurred about one month before the homicide, in which the deceased was shown to have sold some cattle for $189, and this fact was brought home to the knowledge of the appellant; and it was no rebuttal of the State's case, in the assignment of motive, to go back of that transaction, and show that, at a period long previous, the deceased complained of hard times and of a want of money. But, as has been stated, the court admitted a mass of this character of testimony.

3. Appellant contends that the court erred in permitting the State to ask the witness, T. P. McGuire, a number of questions relating to the insurance by him, at some previous time, of a stallion for $2,000. We do not believe that it was legitimate for the State to show, as to this witness, McGuire, that he was engaged in an attempt to swindle the insurance company, as going to discredit him before the jury. The cases do not go to this extent. The answers of the witness, however, tended to exculpate him from said charge, and we fail to see any error as to this matter.

4. A number of bills of exception are presented to the action of the District Attorney, J. T. Daniels, in discussing the case before the jury. From these bills it is evident that said attorney repeatedly traveled out of the record, going to the extent of making assertions even against the record. The attention of the court was called to this matter more than once by counsel for the appellant, and the court as often reprimanded counsel and admonished the jury to disregard all that was said by the District Attorney outside of the record. For this sort of conduct, it occurs to us that, as far as the attorney was concerned, the punishment of the court was not adequate. If one or two admonitions failed to produce the desired effect, as in this case, the court should have imposed such a fine as would restrain such unwarranted conduct on the part of the prosecutor, whose duty it should be, above all things, to stay within the record, and to urge against a defendant only such facts as are proved. It is the duty of counsel for appellant, however, to ask the court to charge the jury to disregard the remarks of counsel outside of the record before he can be heard to complain; the rule being that, unless the remarks, under the circumstances, were obviously of a character to impair the rights of the appellant and prejudice his case before the jury, the case will not be reversed on this ground, unless a charge was asked and refused and exception reserved. Young v. State, 19 Tex. Crim. App., 536; Kennedy v. State, Id., 618; Habel v. State, 28 Tex. Crim. App., 588.

5. The following charge of the court is also assigned as error, to-wit: "You should reconcile all conflicts in the testimony, if you can; but, if you cannot, you must decide which of the testimony is entitled to the greater credibility and weight, and, in so determining, you may consider the intelligence, interest, and apparent bias or prejudice of any of the

witnesses as well as their manner of testifying." This has been approved several times by this court.

6. Appellant assigns as error the refusal of the court to give special charges Nos. 1, 2 and 3, asked by him. The first and third of said charges present phases of the case upon circumstantial evidence. The court gave a charge on this subject which was full enough, and there is nothing in the case to require the court to single out and charge upon the two phases presented in the charges asked. In the second special charge, appellant asked for a charge on alibi. This was sufficiently given in the charge of the court.

7. It is also urged that the case should be reversed, because the jury were permitted to take out, on the back of the indictment, a verdict of a former jury in the case, which, it was claimed, was legible; and in this connection, a motion was made to have the original indictment sent to this court. We find an indictment with the record, but there is no certificate of the clerk to the same. An inspection of this indictment, however, does not indicate that such verdict, as claimed, is legible, and can be read by the naked eye. Moreover, there is in the record the certificate of the judge to the same effect, and the affidavits of three of the jurors. Said affidavits go further, and show that, in their presence, the matter of a former verdict indorsed on the indictment, was not discussed or mentioned by any of the jurors in their presence. We do not think there is anything in the appellant's contention.

8. It is urged by the appellant as a reason why this case should be reversed, that the evidence does not sustain the charge. We have examined the record carefully in that regard. It is a case of circumstantial evidence, and in some respects it is peculiar. It appears that the deceased was an old bachelor, and lived alone on his little farm in the western portion of Hood County, eleven miles west of Granbury, and one and one-half miles from Tolar, a little station on the Fort Worth & Rio Grande railroad; that his was a life of seclusion. His neighbors, and even those to whom he rented a portion of his little farm, rarely visited him. He was last seen alive on the 25th of May, 1894, at Tolar, where he had gone for his mail, as was his custom. One circumstance that enable the fixing of this date definitely, is the fact that he got from the office the Fort Worth Gazette of that date, and this paper was found near his remains when they were subsequently discovered. No one in the neighborhood appears to have missed him for some fourteen days. On the 7th day of June his horse was seen by a neighbor, a renter of the deceased, in an emaciated condition, wandering near his house. This suggested that something was wrong, and this witness went to the house of the deceased, and found there his calf, in a pen, in a starving condition, and also a dog, tied in the same plight. He looked into the house, and found everything torn up and in a state of confusion. Some little search was made on that evening, and the neighbors were notified that night, and on the next day, the 8th, a thorough search was set on foot to discover the deceased. After some hours his remains, or rather the

skeleton and his clothing, a tobacco pouch, which he habitually wore, and some other articles were found. These remains were sufficiently identified as those of the deceased. It was also ascertained that his skull had been penetrated by two pistol or gun shots, and that probably a third shot had entered his side. When the body was discovered, which was in a secluded place in the brush, some little distance from an old road, it was also ascertained that, on the day before, a buggy, drawn by a single horse, had approached within eighteen or twenty yards of the remains, been hitched there, and the steps of a person were trailed from the buggy to near the remains, and to the house of the deceased, and back. It had rained the day before, and there was no difficulty in tracing the buggy and horse, and tracks of the person. This seems to have been the clue which led to the suspicion of the appellant as the guilty party, and ultimated in his arrest and trial. The evidence, we think, conclusively establishes that the deceased came to his death by gunshot wounds, between 2:30 and 3 o'clock on the 25th day of May, 1894. The evidence on the part of the State indicates that the motive for the homicide was robbery, and it is shown that the deceased, not more than a month prior to his death, had sold a little bunch of cattle, and had received therefor the sum of $189, and this fact was known to the appellant. The State also, by a number of witnesses, traced the defendant, on the 25th of May, 1894, from Granbury, his home, to the vicinity of Tolar. A number of witnesses, who were traveling along the route, testify that they met him, and others who lived along the route testify to seeing him pass riding a dun horse. Some of them had previously known him, and others identify him from having seen him on the occasion for the first time. In his defense of an alibi, this is denied, and he is located by a number of witnesses in Granbury, during the evening of said day, from 2 o'clock on. He also offered evidence to the effect that, on said day, he went to his father's pasture, two and one-half or three miles west of Granbury, in the general direction of Tolar, and that, during the whole of said day, he was not beyond that point. The evidence shows that, on the evening of said 25th day of May, appellant had money, and he spent in Granbury as much as $31—a 20-dollar gold piece and some currency. On the next morning, the 26th of May, he is shown to have bought some merchandise, and to have changed two 10-dollar currency bills in the town of Granbury. On that day, about noon, he took the train for Fort Worth. He deposited, at the hotel there, a pistol and a roll of bills. It appears that he and a companion visited bawdy houses at Fort Worth, he paying all the expenses of both himself and his companion, and to have also taken his friend with him to Dallas, and to have been similarly engaged there, paying all the expenses. The evidence traces him, within the next few days, to Cleburne and Corsicana, and at the former place he is shown to have had considerable money, which witnesses describe as currency or greenbacks—a roll of bills. He gave different accounts as to how he had procured the money. On the 6th day of June he returned to Granbury, and on the

7th hired a horse and buggy from a livery stable, with the avowed intention of going to Thorp Springs, three or four miles from Granbury. Thorp Springs is situated two or three miles off the general traveled road to Tolar. He may have gone to Thorp Springs, as he was seen coming from that direction, and going in the direction of Tolar, on said day. He was identified on the route in the vicinity of Tolar, as was also the horse and buggy recognized, and the tracks of this horse, which were of a peculiar character, were identified as being the same tracks that were found on the ground within eighteen or twenty yards of where the remains were found. It is shown that the tracks of this horse and buggy after they got in the neighborhood of Tolar, traveled an unfrequented road in going to the body and returning. There was some effort made by the appellant to show that he did not go to Tolar on said 7th day of June, but we think the testimony is overwhelmingly to the effect that he did. These are the salient features of the case as established by the State. As stated, the appellant relied upon an alibi, and he offered a number of witnesses; and, if their testimony is to be credited, it is impossible that the defendant could have been at the scene of the homicide when it was committed. Appellant also shows that he had money of his own at the time of the homicide; but the proof offered by him in this regard is of the most general character, and to our minds does not account for the quantity of money that the proof on the part of the State establishes that he had at the time. Moreover, the evidence establishes that he expended his money, from the time of the commission of said homicide, up to the time when he returned to Granbury, on the 6th, in the most profligate manner. When he left Granbury, on the 26th, it is not shown accurately how much money he had, yet evidently he had much more than can be honestly accounted for under the testimony offered by him. He spent this in riotous living, and when he returned from his trip, according to his own testimony, he was bankrupt. The testimony otherwise indicates that he was not generally prodigal of his means; at least, no other instance is offered of such useless waste of money by him. The evidence was of a character to convince the minds of the jury that the evidence as to his alibi was either feigned, or that his witnesses were honestly mistaken. The possession of the quantity of money by the appellant was not satisfactorily accounted for on any other hypothesis than that of the robbery of the deceased, and his fatal expedition on the 7th of June to the very scene of the homicide, and to the house of the deceased, cannot be accounted for, in connection with the other circumstances of this case, on any other reasonable hypothesis than that he was the party, or one of the parties, engaged in taking the life of the deceased on the 25th of May. This trip, on June 7th, led to his discovery, and, with the other facts and circumstances in this case, served to weave around him a network of circumstances pointing inexorably to his guilt; and an honest jury could have done no otherwise than did the jury in this case, except that, instead of meting out to him the meager punishment which they did,

they would have been perfectly justifiable in visiting upon him the supremest punishment authorized by law. The judgment and sentence of the lower court are affirmed.

*Affirmed.*