Fred Potts v. The State.

No. 4559.   Decided March 10, 1909.

Rehearing Denied April 14, 1909.

**1.—Murder—Charge of Court—Circumstantial Evidence.**

Where upon trial for murder the evidence showed that the defendant admitted the shooting, and the dying declarations of the deceased were to the effect that defendant shot him, there was no error in the court's failure to charge the law of circumstantial evidence.

**2.—Same—Continuance—Bill of Exceptions.**

Where no bill of exceptions was reserved to the court's action in overruling the motion for continuance, the same could not be considered on appeal.

**3.—Same—Charge of Court—Murder in the First Degree.**

Where the defendant was convicted of murder in the second degree he could not complain of the court's charge on murder in the first degree, although the evidence did not raise the latter issue.

**4.—Same—Charge of Court—Murder in the Second Degree—Manslaughter.**

Where upon trial for murder the evidence did not show adequate cause and the killing was unlawful, the court correctly charged on murder in the second degree.

**5.—Same—Charge of Court—Manslaughter.**

Where the evidence did not raise the issue of manslaugher, but the court correctly submitted the law thereon, the defendant could not complain.

**6.—Same—Charge of Court—Defense of Another.**

Where upon trial for murder there was evidence that the defendant shot deceased in defense of another and not in self-defense, the court correctly charged the law applicable to the defense of another.

**7.—Same—Evidence—Recall of Jury—Practice in District Court.**

Upon trial for murder there was no error that the court, in response to a request from the jury, recalled them and permitted them to examine certain bullets about which the witnesses had testified, and which the jury had not theretofore examined, it being a question in the case whether the size of the bullets fitted defendant's pistol. This was correct practice.

**8.—Same—Evidence.**

Upon trial for murder there was no error in permitting a State's witness to testify to the character of the building in which deceased was shot, to account for the presence of deceased there, as well as to show the relation and connection between the witness and defendant.

**9.—Same—Evidence—Part of Conversation.**

Where upon trial for murder the matter sought to be proved by the defendant could not in any sense be brought within the rule that when part of a conversation is given in evidence the whole may be admitted; and the bill of exceptions did not disclose in what manner the excluded testimony was relevant or could explain a conversation theretofore admitted in evidence, there was no error.

**10.—Same—Misconduct of Jury.**

Where upon a trial for murder the motion for a new trial set up misconduct of the jury by the affidavit of one of the jurors, to the effect that the foreman had stated in their retirement that he knew the defendant to be a mean negro outside of the evidence in the case and that he should be hanged, but there was an unqualified denial of this by all the other jurors who testified and the trial court upon the hearing of this matter · overruled the motion, there was no error.

**11.—Same—Sufficiency of the Evidence.**

Where upon trial for murder the evidence sustained the verdict of murder in the second degree, the same will not be disturbed.

Appeal from the District Court of Grayson. Tried below before the Hon. B. L. Jones.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*Jos. L. Cobb, Cecil H. Smith* and *Jno. C. Wall,* for appellant.—On question of charge on circumstantial evidence: Trijo v. State, 45 Texas Crim. Rep., 127; 74 S. W. Rep., 546; Crowell v. State, 24 Texas Crim. Rep., 404; 6 S. W. Rep., 318; Eckert v. State, 9 Texas Crim. App., 105; Purgear v. State, 28 Texas Crim. Rep., 73; 11 S. W. Rep., 929. On question of misconduct of jury: McWilliams v. State, 32 Texas Crim. Rep., 269; 22 S. W. Rep., 970; Sins v. State, 70 S. W. Rep., 90; Lankster v. State, 42 Texas Crim. Rep., 360; 65 S. W. Rep., 373; Terry v. State, 38 S. W. Rep., 986; McKissick v. State, 9 S. W. Rep., 269.

*F. J. McCord,* Assistant Attorney-General, for the State.

RAMSEY, JUDGE.—Appellant was indicted in the District Court of Grayson County on a charge of murder. On May 14, 1908, he was found guilty by the jury of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of ten years. He promptly filed a motion for a new trial, which contains many grounds, and has duly prosecuted his appeal to this court.

The facts of the case are involved in much doubt and obscurity and while we can not say that the evidence is so inconclusive as would justify us in reversing the case for lack of testimony to support the verdict, it must be confessed that it is more or less fragmentary and far from satisfactory. The testimony, in brief, shows that on the night of January 13, 1908, in a house occupied by appellant and one Mose Williams, which was used as a pool room, about 11 o'clock at night a young negro named Bertram Dudley was killed. Soon thereafter both appellant and one Ed Pitts were indicted. The house where this killing occurred was situated not far from the depot of the Missouri, Kansas and Texas Railroad Company and fronting east. In the front room of this house there was a pool table, and in the rear room soda water and other drinks were sold, and in this rear room was also situated a stove. The following is a fairly correct diagram of the house:

There was a door in the front of the house, one in the west or rear end, and a partition door in the center between the two rooms. On the night of the killing deceased, who was a young fellow some eighteen or nineteen years of age, with a number of other negroes, were in the back room. The evidence shows that Ed Pitts had come to the place early in the evening, and was generally troublesome, and apparently seeking a difficulty with some one, and apparently not caring with whom. At first appellant interfered as a peacemaker, and sought to control him. After some noisy and quarrelsome talk Pitts left the

place, and came back soon thereafter with a Winchester rifle and pistol. Some time after his return he came into the back room of the building in question, where deceased was, near the stove. There was a stick leaning up against the wall near the stove and near where deceased was. Pitts asked him who put that stick there, to which Dudley replied that Fred Potts had put it there. In the meantime, or about this time, the deceased put his hand on the counter standing near by, when Pitts made a stab at his hand with a knife, and some remark was made about his being liable to cut deceased, when Pitts, without provocation, grabbed up the stick and struck Dudley a violent blow, whereupon Dudley ran to the partition door into the front room, known as the pool room. The evidence showed that some few minutes before this defendant had gone into this room and had put out the light there. Just how long he had been out of the west room before the difficulty between deceased and Pitts' occurred the evidence does not disclose, nor does the testimony disclose just what he had been doing in the meantime. That he was in the room, if the testimony is to be believed, is certain, from the fact, soon after the shooting, which occurred almost immediately after deceased rushed into the front room, he opened the front door. There were probably some four or five shots fired. The evidence makes it pretty certain that the second shot which was fired was the shot that killed Dudley. The evidence tends to show that appellant could not have fired more than two of these shots. Williams, the principal witness against him, testified that there were four cartridges in the pistol when Potts got it, and that two of these yet remained in the pistol after the difficulty. There was no ill-will or misunderstanding of any kind shown between deceased and appellant, nor does the evidence suggest any motive for the killing on appellant's part. Deceased was shot in front. He made a dying declaration to his mother to the direct effect that Fred Potts had shot him, though soon after the shooting he made a statement to other persons that Ed Pitts had shot him. But, however, in respect to one of these statements, when Pitts protested he had not shot him, he said, "Well, you know Fred Potts shot me." Mose Williams testified that, soon after the shooting, Potts stated to him that he had fired two of the shots, though he qualified this statement by the explanation that when he fired he thought that Pitts was about to do some injury to him, Williams. The evidence shows, as stated above, that when Pitts and deceased ran out of the rear room, that Pitts was behind and deceased in front. It is difficult to understand how, since deceased was shot in front, such wound could have been made from the pistol of Ed Pitts. His explanation that when he fired the shot he thought Pitts was about to do Williams some injury seems improbable, since Williams had turned Pitts loose some time before any shot was fired. This is probably as strong a statement of the incriminating facts as the proof from any point of view would justify, and is made so that the subsequent discussion of the legal questions may be more readily apprehended.

There are a number of questions raised in the record, some of which we will not undertake to discuss. They have all been carefully investigated, and neither the novelty, difficulty nor importance of them are such as we think require discussion.

1. It is urgently insisted that the court erred in not charging the law of circumstantial evidence. On this question appellant tendered a proper charge, if such instruction was demanded by the facts. Appellant relies largely on the case of Trijo v. State, 45 Texas Crim. Rep., 127; 74 S. W. Rep., 546. That case is in some respects not unlike the case at bar, but there is this difference: There was in the Trijo case, *supra,* no unequivocal admission by appellant that he had shot the deceased. The remark testified to in the case was: "Hist, Celestina, be careful not to say that I did it." The court, as will be apparent from an inspection of the opinion, held that this was not of necessity an unequivocal admission that Trijo had fired the fatal shot, but was consistent perhaps with an appeal or exhortation of Trijo not to go beyond the truth or from enmity or ill-will ascribe the killing to him. The court says, in order to justify the trial court in not charging upon this phase of the law it must be taken as certain, first, that the witness Agular testified truthfully, and growing out of that, secondly, that appellant was at the window as testified by her, and, thirdly, that his remark to her was a *confession* of the killing. We think it is the rule beyond doubt that where, as in this case, there was unequivocal admission of the shooting, that a charge on circumstantial evidence is not required. In addition to this confession, the dying declaration of deceased, as testified to by his mother, was, among other things, as follows: "In that conversation he said he knew he could not live. I asked him who killed him, and he said Ed Pitts hit him across the head with a stick and Fred Potts shot him." This statement assumes positive knowledge and is only to be understood as a direct and positive assertion of a fact within the knowledge of the deceased. We think, in view of the above testimony, the court was not required to give a charge on circumstantial evidence.

2. That ground of the motion for a new trial complaining that the court erred in refusing to grant a continuance can not, of course, be considered because there is no bill of exceptions in the record saving the point.

3. Serious complaint is made that the court erred in charging on the law and submitting the issue of murder in the first degree. We do not believe that murder in the first degree was raised by the evidence. Appellant, however, was acquitted of this grade of homicide. It is well settled by such an unbroken line of authorities as require no citation that where on a charge for murder appellant was acquitted of murder in the first degree, he can not complain either of the fact that such degree of murder was submitted or of errors in respect thereto. This is the settled law of this State.

4. Again, appellant makes vigorous complaint of the action of the court in charging on murder in the second degree on the ground that this grade of homicide was not raised in the evidence. To this conclusion we can not agree. If in fact Fred Potts shot young Dudley, and the killing was not in self-defense, we can not see how under the evidence in this case it could be anything less than murder in the second degree. The law implies malice from the fact of an unlawful killing in the absence of proof of express malice and where there is nothing in the evidence to reduce the grade of homicide to manslaughter or some lesser degree. It is not the law, as we have frequently held, that every killing done from a rash and inconsiderate impulse is manslaughter, but to reduce an unlawful killing to the grade of manslaughter adequate cause must always exist which renders the mind incapable of cool reflection. There is no suggestion in this case of adequate cause.

5. If we are correct in the conclusion announced in the preceding paragraph it would follow that manslaughter was not in the case, and that the court was not required under the facts of the case to charge on manslaughter at all. If, however, it should be conceded that manslaughter was in the case, then an examination of the charge on this issue convinces us that it is practically beyond just criticism.

6. Some complaint is made of the charge of the court in submitting the issue of the right of defendant to kill in defense of another. We think this issue was distinctly raised in the evidence. There was no pretense in the testimony that appellant shot in his own self-defense. The substance of the testimony of Williams is that Potts told him that he had fired two shots, but that he thought that Ed Pitts was assaulting him, Williams. On this question the court charged the jury as follows: "Homicide is justifiable when done by one person to protect another person from death or serious bodily injury, but such killing must reasonably appear, viewed from the standpoint of the person doing the killing, to have been necessary in order to resist an assault apparently violent and imminent towards the person about to be injured.

"Upon this issue the questions for the jury to determine from the facts and circumstances in evidence are: Was the one in whose behalf the slayer acted in present danger of great bodily harm at the time of the killing? Was the homicide committed in a bona fide effort to preserve the person thus threatened from impending danger? One person may act in defense of another person to the extent of taking life, not only when such person's life may be seriously threatened, but he may so do when the inflicting of a serious bodily injury is threatened and the danger is imminent and pressing.

"If a person under such necessity shoots to protect one in such danger and by accident kills still another person who was not making

the assault against the party whom he interferes to protect, a killing under such circumstances would be justifiable.

"If, therefore, you believe from the evidence beyond a reasonable doubt that the defendant did shoot and thereby kill deceased, but you further believe from the evidence that at the time of the killing it reasonably appeared to defendant, viewed from his standpoint alone, one Ed Pitts was making a violent assault upon Mose Williams from which assault, if any, it reasonably appeared to this defendant that the said Mose Williams was in danger of death or of suffering serious bodily injury at the hands of the said Ed Pitts; and you further believe from the evidence that under such conditions this defendant shot at Ed Pitts and thereby killed deceased Bertram Dudley, then such killing would be justifiable, and if you so believe, or have a reasonable doubt thereof, you will acquit the defendant and say by your verdict not guilty."

This was a correct and sufficient submission of this issue and failure of the court to submit this issue would, as we believe, under the testimony, have been reversible error.

7. After the jury had retired and while deliberating in respect to their verdict, through their foreman they made of the court in writing the following request: "Please send us the bullet that was taken from the body of Bertram Dudley; also the one cut from the 32-calibre cartridge." On receipt of this communication, the bill recites, the court refused to send the bullet into the jury room but had the jury brought into the courtroom and permitted those of the jury who wished, to examine said two bullets. Before this was done the defendant objected both to the bullets being sent into the jury room and also to the jury examining the bullets in the presence of the court on the ground that the same was immaterial, irrelevant, prejudicial to the defendant's rights, and that the jurors thereby might form conclusions of their own not warranted by any evidence in the case; but the court overruled said objections and permitted the jurors to examine the bullets in the manner above stated. In this connection it should be remarked that much importance was attached by the State to the kind of bullet and size of the bullet found in and taken from the body of the deceased. The evidence tended to show that the kind of bullet which killed deceased would not have fitted and could not have been fired from the arms which Pitts had, but would have fitted and was the same character of bullet found in and which could be fired from appellant's pistol. Indeed, this was one of the strong inculpatory facts. In approving this bill the court further states that the two bullets in question had been admitted in evidence during the trial, but through inadvertance of the county attorney had not been handed the jury for inspection, and when the above written request from the jury came to the court, the court had the jury seated in the box and in the presence of defendant and his counsel permitted the jury to inspect

the bullets as detailed above. Then the jury were sent back to their room, but were not permitted to take the bullets with them. We not only feel and find that there is no error in these proceedings, but think the court should be commended for the careful safe-guarding of the rights of the accused. The course pursued by him in having the jury examine these bullets in his presence was a more certain safeguard to the rights of appellant than if they had been sent to them in their room. By this course every pos-sibility of mistake or any exchange of the bullets was safely guarded.

8. Objection was made on the trial to the action of the court in permitting the witness Williams to testify over appellant's objection as to the character of the building in which deceased was shot; that is, the purpose for which it was used. The question propounded to him was as follows: "What kind of a business did you and defendant run?" The answer was: "It was a pool hall." The objection to the question and answer was that the same was imma-terial, irrelevant, did not tend to prove any issue in the case, but tended only to prejudice the rights of the defendant. As stated by the court in his explanation of the bill, the full answer of the wit-ness was: "It was a pool hall; I mean by that we had pool tables." While perhaps it was unnecessary to produce this evidence, we can readily understand how natural it was to do so by way of account-ing for the presence of the deceased there as well as for the purpose of showing the relation and connection between the witness and ap-pellant. It seems they were partners in the business and had been for sometime.

9. A more serious question is presented by appellant in respect to his effort to put in evidence some conversation between Williams and himself. The bill evidencing this matter recites substantially that after the witness Mose Williams had been recalled by the State, and on cross-examination had testified that he saw Fred Potts im-mediately after the shooting occurred, and went with him to the Dupree house, where the deceased had been carried, the following question was propounded to him by appellant's counsel: "I will ask you if Fred (meaning the defendant) did not tell you then and there that when the shooting began he was talking to Beatrice Peevy at the front door?" To this question the State objected on the ground that same was irrelevant, immaterial, hearsay and self-serving. If the witness had been permitted to answer, he would have said in response to said question, "Yes." The testimony, if permitted, would have been favorable to the appellant. In allowing this bill the court makes the following explanation: "This witness Mose Williams in examination by the State had testified that im-mediately after the shooting in the room where the deceased was killed he saw Fred Potts and the deceased together, and that wit-ness asked Fred Potts, the defendant, for the pistol; that the

defendant then told witness he had fired some shots; that defendant gave witness the pistol and that the defendant then left the place of the shooting; that witness then took deceased to a neighbor's house, and came back to the place of the shooting and examined the pistol and found that it had been fired two times. After this he met defendant on Mulberry Street, when the conversation occurred that was asked about in this bill of exception; that it was five or ten minutes after the shooting and was not a part of any conversation asked about by the State. The State objected to it because it was immaterial and irrelevant, self-serving, no part of the res gestae and no part of any conversation introduced by the State, which objections were sustained." We had occasion to discuss at some length a question quite like this in the recent case of Pratt v. State, 53 Texas Crim. Rep., 281, 109 S. W. Rep., 138. Article 791 of our Code of Criminal Procedure is as follows: "When part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all other letters on the same subject between the same parties may be given. And when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence." In the case of Greene v. State, 17 Texas Crim. App., 395, it is stated that this article expands the common law rule with reference to such evidence; that at common law, when a confession or admission is introduced in evidence against a party, such party is entitled to prove the whole of what is said on the subject at the time of making such confession or admission. The article above referred to, however, does not restrict the explanatory act, declaration, conversation or writing to the time when the act, declaration, conversation or writing sought to be explained occurred; but extends the rule so as to render such acts or statements admissible, if necessary to a full understanding or to explain the acts or statements introduced in evidence by the adverse party, although the same may have transpired at a different time, and at a time so remote even as not to be admissible as res gestae. We think the test in all cases where the matter sought to be proved is not a part of the conversation already inquired about is, that it must be some statement which is necessary to a full understanding of or to explain the acts or statements introduced in evidence by the adverse party. We think that the matter here sought to be proved can not in any sense be brought within this rule. The bill before us does not disclose how or in what particular the matter was relevant to the issue before the court or how or in what manner it could explain the declaration and statement theretofore admitted in evidence.

Finally, appellant most vigorously assails the verdict of convic-

tion on the ground of the misconduct of the jury, in that as averred, the foreman of the jury, Mr. S. E. Wright, stated in the presence and her ing of the jury, and particularly to one Polk Slaughter, and J. H. Wilson, members of said jury, that "There is no doubt that this negro is guilty. I know him, and he is a mean negro. If you knew what I know you would know he is guilty." In support of the motion Mr. Slaughter filed an affidavit in writing in which he ascribed this language to Mr. Wright. His affidavit further discloses that originally he was for acquittal and finally agreed to come to a penalty of not more than two years. Mr. Wright, the affidavit recites, used the above argument to him and others two or three times, and the jury could not agree; and Mr. Wright's argument above stated influenced him to come from his decisions of an acquittal, of verdict of guilty of manslaughter with a penalty of two years, to a verdict of murder in the second degree with a penalty of ten years. The affidavit of Mr. Wilson was not so strong. It is in substance as follows: "That after the jury retired to consider of their verdict, and after one S. E. Wright had been selected as foreman of the jury, the said S. E. Wright immediately after being selected foreman, said to the jury: 'There is no doubt but that the negro (meaning Fred Potts) is guilty of murder.' This statement was challenged by one or two others, and then the jury began to discuss the case. During the discussion of the case in the jury room the said S. E. Wright, on two different times made this remark: 'If you all knew as much about this matter as I do you would know the defendant was guilty.' He used this argument on two different occasions that I remember. Each time when I would ask him if he knew anything the testimony did not disclose he would say 'No.'" It will thus be seen there is an irreconcilable conflict in the affidavits of the two jurors in respect to the statement of Mr. Wright. According to the affidavit of Wilson there was an express disclaimer of Wright that he knew any fact in respect to the case not disclosed by the evidence. The matter was investigated by the court, and among other persons, Mr. Slaughter was sworn, who in substance confirmed the facts set out in his affidavit, though there is not only some confusion and contradiction in his testimony in respect to what Wright said about the matter, but also considerable contradiction as to when and how the conversation occurred. The following quotation will show the contradictory statement: "The thing that influenced me was this: Mr. Wright first stated as foreman that the defendant, Fred Potts, was a mean negro, and that if we knew him like he did, we would give him 99 years. He just spoke as if he knew him personally. Well, yes, he said that the evidence showed—went on to talk about that place down there, the occurrence, discussing the evidence, and stated that the evidence showed that he was a bad negro, mean negro. He just spoke as if he knew him personally. I believe he said that the evidence showed

that he was a mean negro and ought to be hung or sent to the penitentiary for 99 years. I believe that was about what he said."

The juror Wright was sworn and on hearing before the court stated that he believed defendant was guilty of murder in the first degree and was in favor of the death penalty. That when the jury first went out two of them were for hanging, some of them for five years, and some for fifteen years. He further states: "I did not make any statement in the jury room as to my personal knowledge of the defendant. I might have known the defendant in a general way. I have known a good many of those Potts negroes, but I have no recollection of him at the time. I did not make any statement in the jury room to any juror, or to all the jurors, that if they knew the defendant as well as I did they would want to hang him or give him 99 years, or something of that sort. Nothing of that sort occurred."

R. L. Thompson, another one of the jurors, was sworn and testified, in substance, that he heard someone say that he knew Fred Potts; that Fred had worked for him sometime; that he did not hear this man say that Fred was a bad negro or mean negro, and nothing was said about Fred's character that he heard.

J. H. Johnson, another of the jurors, testified, that while they were considering their verdict he did not at any time hear Mr. Wright state that he knew the defendant, and that the defendant was a mean negro, and was guilty of murder and ought to be hanged, or anything of that kind.

J. B. Curry, another juror, testified to the same effect, as well as one Meyers. In fact, Slaughter's statement found no support in the testimony of the other jurors, but was distinctly denied by practically all of them. The juror Wilson, whose affidavit was attached to the motion for a new trial, was not sworn, and we note a number of the other jurors were not accounted for. We think the rule with reference to granting new trials on account of discussions and statements by jurors in the jury room has already been carried too far. In this case the matters were investigated and the evidence heard by the court. The statement and testimony of Slaughter in respect to the matter was contradictory and confusing. There was an unqualified denial by all the other jurors. The court hearing these jurors, with better opportunity than we can have for determining their credibility, intelligence and weight of their testimony, has held this issue adversely to appellant. We believe that his decision was correct under the facts. In any event, it is obvious under the well settled rule controlling us that we should not interfere with his decision unless it was clearly wrong.

There are other questions in the case, but they are not of such importance as to demand a discussion. It may be an injustice has been done this defendant, but there are some circumstances in

the case from which an inference and conclusion of his guilt might in fairness have been drawn by the jury, and in view of the learned court permitting the verdict to stand, we do not feel that we should interfere; and it is, therefore, ordered that the judgment of the court below be and the same is hereby in all things affirmed.

*Affirmed.*

[Rehearing denied April 14, 1909.—Reporter.]