### ELMER. WARD v. THE STATE.

#### No. 3826.   Decided November 17, 1915.

**1.—Murder—Evidence—Rebuttal—Explanation.**

Where, upon trial of murder, the State introduced testimony to show a premeditation to kill on the issue of malice, there was reversible error in not permitting the defendant in rebuttal to explain his movements and actions consistent with his innocence by showing for what purpose he carried the gun and why he was present at the scene of the homicide.

**2.—Same—Rule Stated—Acts and Declarations of Defendant.**

Where the State proves that defendant went to a place where an offense was committed, defendant may prove acts and conversation explaining the visit. Following Jackson v. State, 55 Texas Crim. Rep., 79, and other cases.

**3.—Same—Rule Stated—Explanation.**

When evidence of an act done is placed in evidence by the State, defendant may prove acts and declarations made at the time, having a tendency to give character to the acts. Following Davis v. State, 3 Texas Crim. App., 91, and other cases.

**4.—Same—Rule Stated—Time of Declaration of Defendant—Res Gestae.**

The explanation, act, declaration, or statement is not restricted to the time when the act, etc., occurred, and if necessary, may be extended to a different time, and so remote as not to be admissible as res gestae. Following Potts v. State, 56 Texas Crim. Rep., 39, and other cases.

**5.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence, although conflicting, sustained the conviction, there was no error on this ground.

**6.—Same—Evidence—Who Began Difficulty—Declaration of Deceased.**

Where, upon trial of murder, there was an issue as to who began the difficulty, the defendant should have been permitted to introduce testimony as to a conversation between witness and deceased as to the whereabouts of the defendant, and that he had better stay away, to show the state of mind of the deceased, and that it might be probable that he committed the acts alleged by the defendant at the time of the homicide.

**7.—Same—Charge of Court—Character and Disposition of Deceased.**

Where, upon trial of murder, there was no evidence of the character and disposition of the deceased, the court should not have submitted this matter in his charge on self-defense.

Appeal from the District Court of Titus.   Tried below before the Hon. J. A. Ward.

Appeal from a conviction of murder; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*S. P. Pounders* and *J. M. Burford,* for appellant.—On question of declarations of the deceased, and as to who was the aggressor: Tankersley v. State, 21 S. W. Rep., 767; Flores v. State, 162 S. W. Rep., 883; Kirklin v. State, 164 S. W. Rep., 1016.

On question of court's charge on character and disposition of deceased:

Foster v. State, 8 Texas Crim. App., 248; Lee v. State. 113 S. W. Rep., 302.

*C. C. McDonald,* Assistant Attorney General, for the State.—On question of explanation of defendant's acts in being at the scene of the murder: Hobbs v. State, 16 Texas Crim. App., 517.

HARPER, JUDGE.—Appellant was convicted of murder, and his punishment assessed at five years confinement in the State penitentiary.

Appellant and Miss Maud Taylor were married some ten years ago, and had one child living, about five years old. In the fall of 1913 they moved from Titus County to Oklahoma, and appellant made a crop in Oklahoma in 1914. In January, 1915, they decided to return to Titus County, but not having money enough to pay railroad fare, and freight on their household articles, it was decided that Mrs. Ward and child return and appellant remain in Oklahoma until he could ship his household goods. Mrs. Ward, upon her return, went to the home of appellant's father, her father being some four miles distant. In February appellant decided to come on to Texas, leaving his household goods in Oklahoma, he saying he had not earned sufficient money to pay the freight. According to all the testimony he and his wife lived together at his father's until the latter part of March, when appellant left his father's home to go in search of work, as he says. Just about the time he left, his wife went to her father's home, and shortly thereafter came and got her trunk. Evidently she intended this for a separation, although appellant says he was not made aware of such fact until he received a letter from his wife after his return to Oklahoma. Appellant did not return to Titus County until some two or three weeks before the homicide, which occurred July 24, 1915. It appears that after her return to the home of her father she went to work to support herself and child, chopping cotton for her father, their neighbors, and doing other character of work that she could find to do. Among others for whom she worked was deceased, a near neighbor. Appellant says he was not aware of this at the time of the homicide, yet he introduced evidence of it on this trial, apparently to throw light on what he says occurred at the time of the homicide. He states that during the week of the homicide he had been at work for Will Stout, who married his sister. That during the week he met Bud Brantley, who had married a sister of appellant's wife, and asked Brantley to try and persuade his (appellant's) wife to return and live with him. That Brantley told him to come and see his wife; that she could have more influence over appellant's wife than he, Brantley, could. Appellant gives this as a reason for going to Brantley's house on Friday afternoon, passing by the house of Bud Merrett, deceased. He carried a shotgun with him, and he says the reason he did so, was that he intended going squirrel hunting with Brantley's son, but he was not at home, and says he told Brantley when he borrowed the gun. After he so testified he desired to prove by Brantley that he, Brantley, had invited him to his house

that appellant might get Mrs. Brantley to intercede with his wife, and also desired to prove by Stout that when he borrowed the gun he told him he wanted it to go squirrel hunting with Brantley's son. The record discloses that the shells he carried with him contained only squirrel shot. The State relied on the fact that appellant went by Merrett's Friday evening with a shotgun; came back by there next morning with this gun in his hands, and finally came to where deceased was plowing and killed him with this gun, as a circumstance tending to show predetermined intention to kill. As the State introduced this evidence to show a predetermination to kill, on the issue of malice, there can be no question appellant had a right to explain his movements and actions, consistent with his innocence, and we think had a right to support such testimony by the testimony of Brantley and Stout. The jury might infer, and doubtless the State would insist that this explanation was an afterthought, and the fact he had told Stout why he was going to Brantley's, before the homicide, and why he desired the gun to take along with him, and the further fact that Brantley had invited him to come to his house to get Mrs. Brantley to intercede for him with his, appellant's, wife, and that was his mission at his, Brantley's home, would have a tendency to sustain appellant's contention and testimony that there was no predetermination to kill, but the cause of the killing arose solely at the time of the difficulty, as contended by appellant. The court erred in excluding this testimony. Branch, in his work on Criminal Law, lays down the following rules, citing the authorities mentioned: If the State proves that defendant went to a place where an offense was committed defendant may prove acts and conversations explaining the visit. (Jackson v. State, 55 Texas Crim. Rep., 79; Johnson v. State, 29 Texas Crim. App., 150.) When evidence of an act done is put in evidence by the State, defendant may prove acts and declarations made at the time, having a tendency to explain or give character to the act. (Davis v. State, 3 Texas Crim. App., 91; Epson v. State, 29 Texas Crim. App., 607; Lancaster v. State, 36 Texas Crim. Rep., 16; Radford v. State, 33 Texas Crim. Rep., 520.) And the explanatory act, declaration or statement is not restricted to the time when the act, declaration or statement occurred, but our statute extends the rule so as to render such explanatory act or declaration admissible, if necessary to a full understanding of, or to explain the acts, etc., introduced in evidence by the adverse party, although the same may have transpired at a different time, and at a time so remote as not to be admissible as res gestae. (Pratt v. State, 53 Texas Crim. Rep., 281; Potts v. State, 56 Texas Crim. Rep., 39; Rogers v. State, 26 Texas Crim. App., 404; Harrison v. State, 20 Texas Crim. App., 387; Sigler v. State, 7 Texas Crim. App., 283.)

Appellant says in returning to Stout's on the morning of the homicide, he passed Merrett's and saw Merrett, deceased, and J. L. Townsend. That he went to the house of his father-in-law, J. L. Taylor, and talked with his wife and boy. That upon leaving to go to Stout's, the road passed within about one hundred yards of where deceased, Merrett,

was plowing. He says Merrett called him and he went to where Merrett was at work, and then he testifies that the following conversation occurred: "We talked in a friendly manner. Then he asked me about the crops and where I had been and such talk as that, and we talked about fifteen minutes, or something like that, I don't know just how long. At the time we were talking Bud Merrett was on the inside of the fence and I was on the outside, and we were about even. I was standing off, I reckon, seven or eight feet from the fence, may be, and he was on the inside. Finally he walked down towards his horse, five or six steps, and he said something about his cotton, and I walked up and looked at the cotton. Of course, we were not standing right in the same place all the time. Finally my wife—he calls her Bubber— he says, 'How did you and Bubber come out?' That is just what he asked me. I asked him what he meant, and he said, 'I mean does she talk like she is going to live with you any more?' I told him I didn't know that it was any of his business, that it looked like it was our affair; I said it looked like it was our affair about that, and I told him I never asked nothing about it this morning and we never had any conversation about it, but from what she said about her things I did not suppose she was, because she had asked me to bring the things down that evening to Mr. Taylor's. He said, 'I can tell you one thing, she will never live with you any more.' He said, 'You will be a blamed fool to want her to, because she don't care a blame thing for you.' I said, 'You seem to know a whole lot about this.' He said, 'I expect I know more than you think.' I said I knew now why my wife had done like she had, that he was the cause of it, and I told him, 'You ruined one woman in this country and now you are trying to ruin mine.' He was standing five or six feet below the fence. He had had his knife in his hand some little bit. When I told him that he said I was a damned liar; he said, 'You cowardly son-of-a-bitch,' and struck at me with his knife and I jumped back from the fence and fired without putting my gun to my shoulder at all."

Appellant was the only eyewitness as to what occurred immediately preceding the homicide, the State relying on circumstantial evidence to show the difficulty did not occur as detailed by appellant, and without reciting the various circumstances introduced by the State, we will say they were amply sufficient to support a verdict of guilty, if the jury took the State's view of the transaction.

We have recited the testimony of appellant, because it becomes necessary in passing on two bills of exception to the exclusion of testimony. Appellant, after so testifying on the issue of who began the difficulty, desired to prove by Paris Corn and Ed Scarborough that shortly before the difficulty, and just before his return to Titus County, they had a conversation with deceased, Merrett, and Merrett asked them if they knew where appellant was, and they answered he was in Oklahoma, and deceased then said, "How do you know he is in Oklahoma?" to which witnesses answered, "Because I have just gotten a postcard from him." That deceased then said, "Well, if he is in Oklahoma, he had better

stay there, and he had better never come back to Titus County." The State was relying upon the fact that appellant was mad or angry because his wife had been working for Merrett, who was a widower, and thought Merrett was trying to take his wife away from him; that Merrett had not called appellant, but appellant had passed the house the evening before with a gun looking for Merrett; had passed there that morning, with his gun in both hands, but did not use it because of Townsend's presence; that appellant had gone back there after Townsend left and shot deceased while he was standing near a post, whittling on it, inside of the fence; that deceased was never nearer than ten or fifteen feet of appellant, who was on the outside of the fence in the road. Appellant was contending that he was standing against the fence, deceased being some feet inside, when the conversation above recited took place, and that deceased rushed at him and cut at him with his knife, when he stepped back and shot. Thus it is seen the testimony of Corn and Scarborough, although not known to appellant, would be of aid to the jury in determining whether the theory of the State or defendant was correct—at least would have a tendency to support appellant's contention—putting deceased in that state of mind where he might probably commit the acts appellant said he did commit. We are of the opinion the court erred in excluding this testimony.

Appellant also contends the court erred in his charge on self-defense in instructing the jury "to take into consideration the relative strength of the parties, and defendant's knowledge of the character and disposition of the deceased." This is a charge usually given in behalf of a defendant, when there is evidence as to these matters in the record. As defendant had testified that he was sick, and had been sick for some time, and unable to work, and was otherwise physically in bad condition, and the size and weight of deceased had been proven, this in and of itself, under this record, would not present reversible error. But as the evidence of any disparity in the size of the men is rather meager, and there is no evidence of the character and disposition of the deceased, on another trial this part of the charge on self-defense will be omitted, if defendant so requests.

There are a number of other bills of exception in the record, and we have carefully reviewed each of them, but neither they nor any of them present any error in the ruling of the court.

The judgment is reversed and the cause remanded.

*Reversed and remanded*